(Court of Common Pleas, Lucas Co., Ohio.)

HENRY E. MARVIN v. THE STATE OF OHIO.

1. Section 3718a, giving justices of the peace jurisdiction in cases of violation of laws to prevent adulteration and deception in the sale of dairy products and drugs and medicines does not confer jurisdiction upon justices of the peace for violations of sec. 6957, of the Rev. Stats., of the state of Ohio.

2. Section 6957, is a statute regulating the sale of poisons, and applies to the ordinary and common transactions of life in the sale of poisons in Ohio, and does not apply to sales of mixtures compounded as medicine, proprietary or prescribed by a physician, even though such medicine contain poisons in solution or in a free state.

3. Defendant sold a bottle of Mrs. Winslow's Soothing Syrup, which is a proprietary medicine consisting of a mechanical mixture of about, one-tenth of a grain of morphine to the fluid ounce, being less than one per cent., and fifty-five per cent. of sugar, about six per cent. of alcohol, and about one per cent. of the oil of anise and the balance, thirty-seven per cent., of water, with a trace of sodium, accompanied with proper directions for use.

Defendant offered to show that this mechanical mixture was a useful remedy and a beneficial medicine, and that as a mixture it was non-poisonous, restorative and curative.

Held: That, it was error to exclude such evidence, and that such evidence,

if true, took the transaction out of the provisions of sec. 6957.

BARBER, J.

This is a case in error in this court to reverse a judgment of the court of Joseph R. W. Cooper, a justice of the peace in and for the county of Lucas. wherein it was adjudged by said justice that the plaintiff in error should pay a fine of twenty dollars and the costs of this action, which judgment was rendered upon the conviction of the plaintiff in error, of a charge which had been prosecuted under sec. 6957, of the Rev. Stats. of Ohio. A bill of exceptions is made a part of the record showing the entire proceedings of the trial by the justice. Numerous errors are assigned and urged for the reversal of the said judgment which can all be disposed of under two general heads, after two preliminary questions are decided.

The charge upon which Mr. Marvin was convicted and sentenced, is found in an affidavit filed in the said justice's court on the 16th day of November, 1897, which charges that, "on or about the 14th day of October, 1897, at the county of Lucas, and state of Ohio, one Henry E. Marvin, unlawfully sold to Frederick W. Herbst, a quantity of morphine, the same being then and there an article belonging to the class usually denominated poisons, said morphine being then and there contained in a certain bottle labelled "Mrs. Winslows Soothing Syrup," and then and there without having marked the word "poison" upon the label or wrapper containing said article.

The law violated, sec. 6957, so far as it is necessary to quote the same, is as follows: "Whoever sells or gives away any quantity of any article belonging to the class usually denominated poisons, to any person, without having first marked the word "poison" upon the label or wrapper containing the same, and registered in a book, to be kept by him for that purpose, the day and date upon which it was sold, or given away, the quantity thereof, the name, age, sex, and color of the person obtaining the same, the purpose for which it was required, and the name and place of abode of the person, for whom the same is intended, shall be fined not more than two hundred dollars, nor less than twenty dollars."

The first attack made upon the 'affidavit is, that it prefers no charge against Mr. Marvin within the provisions of the statute. It is said that it is nowhere alleged that the morphine was not sold upon the prescription of a physician. Without discussing it, the point made is not well taken. A fair and reasonable construction of sec. 6957, prohibits the sale of poison to any person, without labelling it as required by the statute.

The phrase "except, upon the prescription of a physician," applies to the sale of poisons to minors, and does not apply to the sale of poisons to other persons, and Mr. Marvin is fairly and properly charged with selling morphine, which was then and there poison, without labeling the same.

It is next contended that sec. 6957, so far as the some relates to morphine, or any of its salts, is repealed by implication by the subsequent passage of sec. 4238-27, which makes it unlawful for any person other than a wholesale druggist or a dealer in drugs, to sell or offer for sale at retail, morphine, or any of its salts unless the same shall be wrapped as provided in said section. Without discussing this point—for it would extend this opinion to an unwarrantable length, to go into a discussion of all the points raised, I hold that the point is not well taken. Repeals by implication are not favored, and no repeal by implication is adopted by the court, unless the terms of the later statute are contradictory and repugnant to former statutes.

There is no such contradiction, and no such repugnancy between sec. 4238-27, and sec. 6957, as would warrant the court in holding that the latter was repealed.

We come now to consider the vital questions raised by this record, and they will be discussed under two general heads,

1. The question of jurisdiction:—This point is raised in every conceivable way known to the practice, and in ways not known. It is claimed on the one side, that the justice had no jurisdiction to summon a jury and try Mr. Marvin on this charge, and on the other side, that the justice had ample jurisdiction to empanel a jury, and pronounce judgment upon the conviction of the defendant.

Counsel for the state in their brief say, with brevity and exactness, "that for the jurisdiction of all courts, including justices' courts, we are compelled to look to the statutes. Neither, in the source of authority, is superior to the other. All must go to the law for whatever jurisdiction they may rightfully exercise."

Sec. 456, of the Rev. Stats.; defining criminal jurisdiction of courts of common pleas, says: "It shall have original jurisdiction of crimes and offenses, except in cases of minor offenses, exclusive jurisdiction of which is vested in justices of the peace, or that may be vested in courts inferior to the common pleas."

Sec. 610, of the Rev. Stats., provides, that justices of the peace shall have jurisdiction in criminal cases throughout the county for the purpose of bringing defendants before them and inquiring into the complaint and discharging, or recognizing them to appear before the

proper court, or otherwise dispose of the complaint as is provided by law.

The rule requiring a strict construction of penal statutes does not apply to the question of jurisdiction.

All doubts and presumptions are in favor of the jurisdiction of the tribunal exercising it.

Endlich, Interpretation of Statutes, sec. 157; 1 Bishop on Criminal Practice, sec. 315; Bishop on Stat. Crimes, secs. 164, 198; Smith v. People, 47 N. Y., 330.

The court of common pleas is a court of general jurisdiction of all crimes and offenses in Ohio.

The justice court is a court of limited jurisdiction. If all the statutes conferring criminal jurisdiction upon justices be considered, it is not to be disputed that the justice court is one of exceedingly limited jurisdiction.

If anything can be positively deduced from the passing of statutes and the decisions of courts in Ohio, it is that the jurisdiction of justices in matters affecting personal liberty and in all matters of punishment for crime is sparingly and jealously conferred.

Wherever conferred, however, the courts have unhesitatingly favored and sustained their jurisdiction, and within such jurisdiction they have as full and complete authority to hear and determine as does any other tribunal.

I do not understand these propositions to be disputed. It is not disputed that a justice has no jurisdiction of this offense, unless it is expressly conferred by legislative enactment.

The only provision of the law which it is claimed does confer jurisdiction upon justices of offenses of this kind, is found in sec. 3718a. So far as applicable, this section is as follows: "Any justice of the peace within his county and city shall have jurisdiction in cases of violation of the laws to prevent the adulteration and deception in the sale of dairy products and drugs and medicine."

The word "adulteration" is most explicitly defined by statute in the chapter regulating that subject. The word "deception" is nowhere defined by the statute. The word "deception" has no statutory definition. Adulteration is a crime defined by law. Deception is not a crime, and is nowhere defined by law. The great object in the construction of statute is to ascertain the intent and carry it out. The court does not make the law, but decides it.

"Legislative intent can only be arrived at by giving to the language its ordinary import.

State v. Peck, 25 Ohio St., page 28.

A great deal was said in argument concerning the evil besetting this commonwealth in the sale of nostrums and patent medicines. We were eloquently urged to place ourselves in the position of the legislature and view the neces-

sity then in existence for a more effectual enforcement of the law to prevent adulteration of food, drink and drugs, and to consider the total inadequacy of our courts, all of them at the time over crowded with work.

All of these things are matters of concern in the construction of statute, but can not carry us beyond fundamental principles. The supreme court, long ago, in 5th Ohio Reports, page 494, said: "A new meaning can not be given to words because such was the probable intention of the legislature, nor the law controlled by the peculiar circumstances of one case or any number of cases. It is elementary law, that the reasonable import of words, and not speculation, is to be followed." When the well known rules of construction are applied to this statutory provision of, "the adulteration and deception in the sale of dairy products, drugs and medicine," what is the rational and fair construction of the same? It is perfectly clear, applying to it every possible test, that those words do not allow the construction contended for by the state. It is strained, and violates all well known principles of construction. In reaching this conclusion one should not be unmindful of the rule that in a case of this kind, in a lower court, all doubt should be resolved in favor of sustaining the judgment, and if there was any doubt about the matter, I should not hesitate to follow it. Another rule, however, is just as well settled, and that is, that no court should allow a judgment to stand, when convinced beyond any reasonable doubt, that the same is contrary to law.

It is said, that the statute upon which this offense is based, was a statute to prevent deception in the sale of poison, and counsel define such deception to be that kind of deception which is the result of intent, or carelessness.

"Deception", as generally understood, counsel says; "deception as defined by the lexicographers, Webster and Worcester." The first reply to that is, that there being no statutory or legal definition of this word, "deception," and there being no distinct crime of deception according to the law of Ohio, it is very unsafe and dangerous, in criminal jurisprudence to rest upon any vague or comprehensive or popular definition. Certainly, we should be favored with authority, statutory or otherwise, of legislative intent so to do. Nowhere in the statutes is to be found any legislative authority for such definition.

The rule of construction is not forgotten, as it is expressly enunciated in Bloom v. Richards, 2 Ohio St., p. 402, that "it is presumed that every word in the statute is inserted for some purpose." What is the word "deception" there for, is asked. The court, it is said, must give it some meaning. Mean-

ingless words sometimes occur in statutes. Surplusage, redundancy and meaningless words, are not infrequent in legislative acts. The legislatures of this country are the only legislative bodies in this world that do not have a commission to examine the language and the words of a statute, before it is enacted into law. When we consider our methods in this respect, we are prepared for just such questions as are raised by the counsel for the state in this case. The same tribunal that enunciated the above principle of law, that "every word in a statute is inserted for some purpose" also said, in Cook v. Cartwright, 40 Ohio St., pages 243, 252, that "instances of the presence in a statute of words to which effect can not be given have often occurred."

Perhaps the above is unsatisfactory. It is the better answer to say, that the word "deception", as used in sec. 3718a, means, deception because of, or the result of adulteration- and deception caused by the imitation and counterfeiting of the natural products of food, such as cheese, butter, and all artificial and counterfeit foods and drinks.

There are many reasons for such construction, a few of which only, is it necessary to state. The best reason for this construction, in fact, and the strongest of all, is found in the statutes themselves. Sec. 6957, according to all reasonable construction, is a statute regulating the sale of poisons without a label. It is not a provision against adulteration. It is not a law against deceiving the citizen by imitation or by fraudulent substitutes. It is a law simply defining the ordinary transaction of life in the matter of the sale of poison. When we read the pure food laws and the pure drug laws, we find express provisions against adulteration of food, against fraudulent and counterfeit products of food and drink, and against deceptive substitutes. We find them all fully defined and fully punished. We find adulteration of drugs defined and punished. It may be, and probably is, true that there are no provisions as to artificial and fictitious drugs. But that does not make any difference, there is much deception in the adulteration of drugs. We naturally conclude that the word "deception" in the sale of dairy products drugs and medicine, means those deceptions that necessarily result from adulterations, and fraudulent practices, in the pure food and pure drug laws. "Deception" in this sense is the word used frequently in both pure food and drug laws. Here we are on safe ground. This construction is reasonable and natural and inviting. The statutes themselves seem to suggest and force this meaning of "deception" upon us. There is no far fetched argument. There is no legal juggling or specula-

ting. It is a common sense construction, when the pure food and pure drug laws are examined as a whole. Had I not heard the able argument of the attorneys for the state, I would say that no other construction could possibly occur to a legal mind.

Another reason for this construction is to be given, and the authority for the same is found in many decisions of the supreme court, that wherever there is doubt in the construction of the statutes, great attention is due to the title of the act. The title of an act is not decisive, but is entitled to great weight. Sec. 6957, originally was passed in 1852, and is found in Vol. 50, Ohio Laws, p. 167. The title of that statute is, "regulating the sale of poison." It is a general statute, there is nothing whatever in it concerning deception or adulteration. Nothing whatever in it warranting the definition that is now contended for the word, "deception" It was plainly intended, as designated by its title, to regulate the sale of poison, and was passed long before the law respecting adulteration of foods and drugs. The title to statutes regulating the adulteration of foods and drugs is found appropriately to state the purpose and object of those acts. For example, the act passed March 20, 1884, is entitled "To provide against the adulteration of food and drugs." Again, attention is also due, says the supreme court, in doubtful questions, as to the place occupied by a statute. The force of this argument is not only recognized by the supreme court in its decisions, but in the act appointing commissioners to revise and consolidate the general state laws of Ohio, the legislature expressly directed, among many other things, that the statutes should be arranged under appropriate divisions. Examination shows that the pure food and drug laws are properly classified according to law. Sec. 6957, is not found in the chapter on adulteration, but is found in another chapter, and is included among the offenses against public policy.

Another reason for the construction adopted is, that if we apply the principle of construction, now become a well known maxim of the law, to-wit: *noscitur e sociis*, the perplexing question is easily solved. The expression is "adulteration and deception," and the word "deception" is used conjunctively with adulteration, and is to be treated and construed in connection with conjunctive associate.

The last reason that I care to give, supporting the adopted construction, is, that the legislature itself has classified offenses of the kind charged against Marvin, as different from offenses against adulteration and deception in the sale of foods and drugs. In the act creating the dairy and food department, is found

this explicit language: "The commissioner is charged with the enforcement of all laws against fraud and adulteration, or impurities in food or drugs, and unlawful labeling in Ohio." Could there be a more satisfactory and distinct recognition of two classes of offenses? Because the justice is given jurisdiction in adulteration and deception of foods and drugs, is no reason whatever for concluding that jurisdiction is also given to the justice in offenses against unlawful labeling. The conclusion is directly the reverse. Jurisdiction being given in the one case by express language, the inference that it was intended to be given in the other is expressly excluded. If it is practical and wise, for the commissioner to prosecute offenses against unlawful labeling before justices, it is an argument for the legislature, and it is to be presumed that they will act rightly when attention is called to the subject. Until it is declared by some reasonable expression, that the justice shall have such jurisdiction, the courts must confine the commissioner to the methods now provided by law for offenses against unlawful labeling. No great hardship can come from the construction adopted. The common pleas court has jurisdiction, the probate court in many counties—including this county, is open to him in these prosecutions without indictment, and with little hindrance. I do not believe there is a prosecuting attorney in Ohio that will not encourage him, and permit him absolutely to control and conduct prosecutions in the probate court.

Against the conclusion reached, I have been favored with no authority, or no argument, that is satisfactory or convincing. More plausible argument was made in favor of the other construction than I would have thought possible. But it cannot prevail against the reasons given. I have examined carefully the case of the State v. Ruedy, in 39th Law Bul., p. 42, lately decided. There is in the opinion no foundation for the comfort, counsel for the state claim to have received from the case. That decision, so far as it goes, is against the state. From the opinion we learn that the justice of the peace has jurisdiction in a case of selling oleomargarine which contained coloring matter, upon the express provisions of a law that an article of food shall be deemed adulterated if it be colored, and that oleomargarine is an article of food.

### Errors occurring at the trial.

All the exceptions assigned upon this record occurring at the trial may be considered together. The exceptions are very numerous, and comprise alleged errors in the admission of testimony, in the rejection of testimony, in the charge of the court, and that the verdict is contrary to the evidence and the law. The responsibility of deciding these numerous questions might easily and properly be avoided, for the reason that the judgment must be reversed upon error in exercising jurisdiction. But as the case is going to the supreme court, and as it is very desirable to get the construction of that court upon all of these questions, I willingly consider and decide them. Whether or not there are errors in this record depends entirely upon the construction to be given to the statute under which Marvin was convicted, viz: sec. 6957:

"Sec. 6957. [Selling or giving away poisons.] Whoever sells, or gives away, any quantity of arsenic less than one pound, without first mixing therewith soot or indigo in the proportion of one ounce of soot or half an ounce of indigo to the pound of arsenic, or, except upon the prescription of a physician, sells, or gives away, any quantity of any article belonging to the class usually denominated poisons, to any minor, or sells, or gives away, any such article to any person, without having first marked the word "Poison" upon the label or wrapper containing the same, and registered in a book to be by him kept for that purpose, the day and date upon which it is sold or given away, the quantity thereof, the name, age, sex, and color of the person obtaining the same, the purpose for which it is required, and the name and place of abode of the person for whom the same is intended, shall be fined not more than two hundred nor less than twenty dollars."

It will be well to note here briefly, the transaction itself which is claimed to be criminal. Mr. Herbst, one of the drug inspectors under the dairy and food commissioner, purchased of Marvin, the bottle of Mrs. Winslow's Soothing Syrup. He asked for no article belonging to the class usually denominated "poison." He asked for an article which the defense offered to show was a well known proprietary remedy or patent medicine, of nearly fifty years' standing. It is undisputed that said proprietary medicine is a mechanical mixture, consisting of about one-tenth of a grain of morphine to the fluid ounce—less than one per cent., and 55 per cent. of sugar, about 6 per cent. of alcohol, and about 1 per cent. of the oil of annise, and the balance, 37 per cent. of water, with possibly a trace of sodium, accompanied with proper directions for use. The defense offered to show that this mechanical mixture was not only a proprietary medicine of long standing, but was also a useful remedy and medicine. And it was offered to prove by physcians of unquestioned standing and ability in this community, that the mixture, as a mixture, was non-poisonous, and the properties of said mixture were restorative and curative. Such evidence was excluded. It is conceded that the morphine in the mixture constitutes less than one per

cent. of the mixture. It is conceded that the ordinary dose of morphine is about one-eighth of a grain, which is more than is found in a fluid ounce of this mixture. It is conceded that morphine, properly combined with other drugs, is one of the best known medicines, and most beneficial of remedial agents.

The affidavit charged Marvin with selling a quantity of morphine, the morphine being then and there one of the articles belonging to the class usually denominated poisons without having marked the word "poison" upon the label of the wrapper containing the same. The construction given to this statute by the state, and maintained throughout the trial, from the first syllable of evidence to the final charge of the court, was, that it prohibited the sale, without the label "poison," of any quantity · of morphine, whether the same was sold in a free state, or in a mechanical mixture, or in the form of a proprietary medicine, or under prescription of a doctor, without regard to whether the mixture containing the morphine was a medicine, or was poisonous or non-poisonous. By the construction contended for it would be impossible for the wit of man to conceive of the sale of any article belonging to the class usually denominated "poison," in any quantity, however small, or in any sort of a medicinal combination, if unlabeled, without violating the statute. It is conceded by the record that morphine is a deadly poison, and belongs to the class usually denominated poisons. Therefore, if the construction contended for be the true one, the theory upon which this case was tried was correct, and a careful examination of the record fails to disclose any substantial or prejudicial error occurring at the trial. The justice presents this severe construction of the statute to the jury very plainly. If this construction of the statute be not sustained, then the record before us contains errors too numerous to mention. Errors in admitting evidence, in the rejection of evidence and error in the charge of the court. And the verdict is contrary to the evidence and the law.

What is the construction of sec.. 6957? Upon the decision of this question turns the decision of all the errors assigned. The great object in the construction · of statutes is to ascertain the intent and carry it out.

Legislative intent can only be arrived at by giving to the language its ordinary and known import.

Endlich, Interpretations of Statutes, sec. 2; State v. Peck, 25 Ohio St., p. 28.

It is submitted that the construction contended for by the state is unwarrantable, unsound, unreasonable, contrary to the plain meaning of the language used, and leads far beyond the intention of the legislature. The construction contended for by the state is harsh and severe, and creates offenses which entrap the unwary.

The construction adopted by the court below, renders criminal millions of transactions that have occurred in Ohio during the past fifty years, and are occurring daily. For, the prescription of every physician containing morphine or opium or strychnine or arsenic, that is given as a medicine, and that is filled by the druggist, would have to be labeled a poison. If the mixture or medicine so sold contains so little of the poison the effects of which were beneficial and not injurious, the statute would still be violated. Every sale of many a remedy, that has been in use for years, would have to be stamped "poison." I instance Dover's powders, and paregoric, and syrup of epicac. Others might be given.

Is it possible that this statute is to be so construed, that prescriptions of physicians, and these ordinary remedies, are to be labeled poisons? Clearly not. And the best argument against it is, that it was never thought of in Ohio until this prosecution.

"Wherever a statute admits of two constructions, we are bound to presume that the legislature intended to do that which is clear, manifest and just. The presumption against absurdity in the provision of a legislative enactment is probably a more powerful guide in construction than the presumption against unreasonable inconvenience or injustice. The legislature cannot be supposed to intend its own stultification. When, therefore, to follow the words of an act leads to absurdity in its consequences, that constitutes sufficient authority to depart from them."

Endlich, Interpretation of Statutes, sec. 258-264.

"A construction leading to absurd consequences will be deemed not intended, and language will be restrained accordingly." 39 Ohio St., p. 651; 50 Ohio St., p. 661.

"The law is made not for the benefit of this or that class of men, but for the community at large, and every statute should receive such a construction as is consistent with the common sense of that community." Hitchcock, J., 5 Ohio, p. 65.

This is the highest authority for construing the statute as a general statute, regulating the sale of poisons, as commonly understood in the ordinary transactions of life.

In support of the construction contended for by the state but two arguments were offered that merit attention. It was claimed that we should put ourselves in the place of the legislature, and look to the fearful evils that were being produced by the sale of patent nostrums, containing poisons without labeling them, and thus deceiving the citizen and·

creating appetites and physical conditions that could only be relieved by the mixture that caused them. Many evils are worked by patent nostrums, but "what is called the policy of the government with reference to any act of particular legislation, is conceded to be too unstable a foundation for the construction of a statute. The clear language of a statute can neither be restrained nor extended by any consideration of supposed wisdom or policy."

Endlich, Interpretation of Statutes, sec. 5.

It is not to be denied that the policy of the law and the evils to be reached are to be considered. If we, as counsel for the state invite, place ourselves back in 1852 at the time this statute was enacted, and again in 1880 when it was revised, using the light thereby derived, what is the natural construction? Clearly the one that has been adopted and followed during all this time. These evils and deceptions in the sale of nostrums, without a label, are matters entirely for the legislature. It is clear that it was never intended this statute should have any such construction.

The other argument adduced was, that any other construction would permit these poisons to be sold in any quantity, providing they were sold in a mechanical mixture of some kind, and labeled with some trade mark or proprietary device. If this be true, it is for the legislature. If the legislature has not provided against the sale of proprietary medicines, and doctor's prescriptions, and home remedies, containing poisons, without labeling them, or otherwise indicating their contents, it furnishes no reason for the courts carrying sec. 6957 against a plain and sensible construction.

But I do not admit the proposition. We have no case before us that a mixture was sold under pretense of a prescription of a doctor, or under the name of a patent medicine, which contains so much poison that it becomes substantially a sale of poison. When the quantity of the morphine, or chloral, or cocaine is so large and so injurious and dangerous that the sale of it in such mixture is but a mere evasion of the statute, the courts will promptly construe the transaction to be a violation of the statute. Courts look through forms and pretenses. If the transaction itself becomes, in fact, the sale of a poison, it will not be beyond the reach of the statute because it contains some patent medicine wrapper. The court charging the jury will hold that men cannot evade the statute by mere forms and formulas and wrappers, and the jury will be instructed accordingly. We have no such case here. The defendant offered to show that the sale of Mrs. Winslow's Soothing Syrup was not the sale of a poison, but the sale of a medicine as such. He offered evidence tending at least to show that the morphine in it was so small that the mixture was valuable as a medicine. In fact, he offered to show that the mixture was non-poisonous and a useful and valuable remedy. Testimony of this kind should have been admitted, for no one can decide whether the transaction, which this record reveals, was criminal without all the facts of the transaction before him.

The severity and the absurdity of the claimed construction of sec. 6957, cannot be better illustrated than by a brief extract from this record. I quote from page 47 and 48. Doctor John North, who the record shows, is a skilled and high authority on the subject of medicine and drugs, is on the witness stand.

"Q. State what, if any deleterious health or life-destroying results you have ever observed from the use of plaintiff's 'Exhibit 1,' (referring to Mrs. Winslow's Soothing Syrup?)

"Objection. Exception:

"Defendant's counsel offer to prove by the witness, if permitted to answer, that he knew of none whatever.

"Q. What poisonous results, if any, have you observed from the use thereof?

"Objection. Exception.

"Defendant's counsel offered to prove by the witness, if permitted to answer, none, and that morphine is not a poison so long as it produces medicinal, restorative or life-giving effects or results."

The record shows an admission that Doctors Van Pelt, Bedman and Brewer, if the same questions had been asked of them, each and every one of said doctors, would have given the same answer that Doctor North would have given, had he been permitted to testify.

Can it be possible that such a construction is to be given to sec. 6957, as rendered incompetent and immaterial such evidence, where the defendant is charged with selling a poison as commonly known and designated?

The question under investigation is, whether the transaction was the sale of a poison or the sale of a medicine.

The authority often quoted herein, Endlich, says, "that the best exposition of a statute, or any other document, is that which it has received from contemporary authority," and under contemporary authority he includes long usage.

In a case like this, the practical construction, given to a statute for a great many years, is entitled to more than ordinary weight. It has been said that usage and practical construction for a long time of an obscure law, is the only interpreter.

Endlich, Interpretation of Statutes.

The high authority of a long continued practical construction of statutes, has been sanctioned by our Supreme Court in numerous decisions. In Chestnut v. Shane's Lessee, 16 O. R., p. 600, the Su-

[COPYRIGHT, 1898, BY CARL G. JAHN.]

·preme Court said, in 1847, "In constru-ing ancient statutes, contemporaneous construction, as evidenced by usage, will not be departed from without most cogent reasons. If the construction be doubtful,, usage will control."

Numerous other decisions from our Supreme Court can be given to the same effect.

The practical construction given to sec. 6957, for now nearly half a century, has been directly contrary to the con-struction urged. Until this case was pro-secuted, no one ever thought that the law required the numerous prescriptions which druggists of Ohio have filled, con-taining morphine or other poisons, to be labelled as poisons, and a record to be kept as required by this statute. It is a fact beyond dispute, that nearly one-third, at least fully one-fourth, of all the prescriptions given by physicians in Ohio, contain poisons, morphine and opium being common poisons prescribed. It is a fact further, that these prescrip-tions, as a rule, contain more of such poisons, relatively, than the mixture sold by Marvin. There is scarcely a cough syrup prescribed by any physic-ian, which does not contain morphine, or opium, or some other form of such poison, which is the equivalent of morphine, in an equal proportion or greater, than that contained in this mixture. No one has ever construed this statute as prohibit-ing the sale of such mixtures as poisons. Dover's powders have been a well known medicine and remedy for one hundred and fifty years. The dose of Dover's powder is from five to fifteen grains—if we take the middle dose, say ten grains; it is composed of one grain of opium, one grain of epicac, eight grains of sugar of milk (U. S. Pharmacopoeia—last edi-tion). The U. S. Dispensatory gives one grain of opium ordinarily to be the equivalent of one-tenth of a grain of mor-phine. Therefore, a ten grain Dover's powder, contains exactly as much poi-son, the equivalent of morphine, as an ounce of this mixture. The druggists of Ohio never construed this statute as re-quiring them to label Dover's powder a poison. Take another very common house-hold remedy, paregoric. It is pre-scribed by the most eminent physicians. The Pharmacopoeia says, that it is com-posed of opium, benzoci acid, camphor, oil of annise, alcohol and glycerine. There are two grains of opium to every fluid ounce of the mixture. Therefore, every fluid ounce of paregoric contains the equivalent in poison of one-fifth of a grain of morphine, which is double the poison in an ounce of this soothing syrup. Has it ever been thought, that the sale of paregoric by a citizen of Ohio, with-out labeling it poison, was a criminal act? Other instances could be given. These are all facts of common knowl-edge, and all proper for the court to con-sider in giving construction to this stat-ute. Courts will take judicial notice of facts of common knowledge. The con-clusion reached is, that the statute in question is not a statute governing the sale of mixtures compounded as medi-cines, whether proprietary or prescribed by a physician, even though such medi-cines contain poisons in solution or in a free state.

This is a statute regulating the sale of poisons and it governs the ordinary and common transactions of people in the selling of poisons in Ohio, and does not apply to the selling of poisons in harm-less mechanical mixtures, or in proprie-tary mixtures that are beneficial medi-cines, or to poisons contained in medi-cines prescribed by physicians for the cure of disease. It is never permitted, it is intolerable, to create offenses by mere construction.

50 Pa. State, page 207.

I will not conclude this somewhat lengthy opinion without giving public acknowledgment to the help derived from counsel upon both sides of this case. The oral argument of all the at-torneys was comprehensive, and both parties submitted able briefs. That of counsel for the plaintiff in error being also exceptionally exhaustive.

This judgment is reversed, for the rea-son that the court had no jurisdiction of the offense; for the further reason that the court erred in the exclusion of evi-dence and erred in its charge to the jury; and for the still further reason that the verdict of the jury is against the evi-dence and contrary to the law.

King & Tracy, Attorneys for plaintiff in error.

J. M. & W. F. Brown, Attorneys for the State.